**MOORE et al. v. CALIFORNIA–WESTERN STATES LIFE INS. CO. et al.**

**No. 4143.**

Court of Civil Appeals of Texas. Amarillo. Feb. 12, 1934.

Rehearing Denied Feb. 12, 1934.

Cooper & Lumpkin, of Amarillo, for appellants.

J. B. Keith and Chandler & Chandler, all of Stephenville, for appellee Mercury Moore.

Madden, Adkins, Pipkin & Keffer, of Amarillo, for appellee Insurance Co.

HALL, Chief Justice.

May 6, 1932, the appellee insurance company issued a policy of insurance upon the life of I. S. Moore, providing for triple indemnity in the event of insured meeting his death while riding in a private automobile. The policy named Mrs. Annie Moore, wife of J. W. Moore and the mother of insured, as beneficiary. January 27, 1933, thereafter he was killed while riding in a private automobile as the result of an accident. February 7th following his mother, Mrs. Annie Moore, made proof of death, which was accepted by the company and a check for $3,000, being three times the face of the policy, was issued payable to her, but prior to its delivery the appellee Mrs. Mercury Moore, the wife of I. S. Moore, learned of the death of the insured and filed her claim with the insurance company for the amount due under the policy. Then the insurance company filed this suit against Mrs. Annie Moore, her husband, J. W. Moore, and made Mrs. Mercury Moore a party, and in its petition set out all the facts relating to the issuance of the policy, the death of the insured, admitted its liability to some one, praying that the defendants be cited to appear and that the court determine upon the trial to whom the plaintiff should pay the amount of the policy. The policy was issued in the sum of $1,000, and plaintiff paid into the registry of the court the $3,000 for which it admitted it was liable.

While a general demurrer and special exceptions were urged by the appellants in the lower court, no question is raised here by either party by any proposition challenging the sufficiency of the pleadings.

Mrs. Mercury Moore alleged that she was married to I. S. Moore August 20, 1926; that they were never divorced; that the marriage relation existed from said date until the death of I. S. Moore on January 27, 1933; that at the time of their marriage neither party possessed any property, real or personal; and that all the property acquired and owned by them at the time of the death of her said husband was community property.

It was shown that after their marriage on August 20, 1926, I. S. Moore and wife resided with his parents in Hutchinson county for about eight months; that they then moved to a farm near White Deer, living in that community about four years; that during that time they bought cows, sold milk and butter, and in the crop year of 1930–31, they planted and harvested a wheat crop; that I. S. Moore's portion of said crop amounted to 8,-000 bushels; that in March, 1931, they purchased a section of land from one Terry and borrowed the purchase money from an uncle of I. S. Moore which was used in paying for the section; Mrs. Mercury Moore testified that she saw the deed at one time and that it recited that the land was conveyed to Mrs. Annie Moore, the mother of her husband; that the 8,000 bushels of wheat were delivered by I. S. Moore to his uncle, which Mrs. Mercury Moore testified was to be applied to payment for the land. It further appears that in September, 1931, I. S. Moore deserted his wife, after sending her to Hot Springs, N. M., on a visit to her uncle, and in May, 1932, thereafter, he procured the issuance of the policy insuring his life, the amount of which is involved in this suit. Mrs. Mercury Moore testified that she did not know of the issuance of this policy in favor of her mother-in-law until after his death. Her contention in the lower court, which is the principal point urged in this appeal, is that, in having the policy issued to his mother, her husband intended to defraud her and because he paid the premium, amounting to $27.59, out of community property, she is entitled to the proceeds of the policy now in the registry of the court. It was shown that neither she nor her husband, I. S. Moore, had any children or ever owned any separate property.

The case was submitted to the jury upon one special issue as follows: "Do you find from a preponderance of the evidence that the insured, I. S. Moore, named the defendant Mrs. Annie Moore as beneficiary in the policy introduced in evidence in this case for the purpose of defrauding the right of Mrs. Mercury Moore of her interest, if any, in the community estate of him, the said I. S. Moore, and his wife, Mrs. Mercury Moore?"

This issue was answered in the affirmative, and judgment was rendered in favor of Mrs. Mercury Moore for the whole amount claimed.

R. S. art. 4619, as amended by the Acts of the 40th Legislature (1927) c. 148 (Vernon's Ann. Civ. St. art. 4619), provides that during coverture the common property of the husband and wife may be disposed of by the husband only, and the courts have uniformly upheld transactions wherein the husband has disposed of community funds, unless it appeared that such disposition was made in fraud of the wife's rights. Shaw v. Shaw (Tex. Civ. App.) 28 S.W.(2d) 173; Briggs v. McBride (Tex. Civ. App.) 190 S. W. 1123; Krenz v. Strohmeir (Tex. Civ. App.) 177 S. W. 178; Moody v. Smoot, 78 Tex. 119, 14 S. W. 285; Martin v. Moran, 11 Tex. Civ. App. 509, 32 S. W. 904; Martin v. McAllister, 94 Tex. 567, 63 S. W. 624, 56 L. R. A. 585.

The contention of the appellant, Mrs. Annie Moore, is that she was not made beneficiary in the policy by her son for the purpose of defrauding the appellee Mrs. Mercury Moore, and that the finding of the jury that I. S. Moore had the policy issued to his mother as beneficiary for the purpose of defrauding his wife is not supported by the evidence.

After a careful review of the statement of facts, we are convinced that the evidence is sufficient to sustain the jury's finding, and the conclusion is inevitable that he had determined to abandon his wife and to deprive her of all interest in the community estate. Mrs. Mercury Moore testified that during the four years they lived in Hutchinson county immediately following their marriage her husband bought and sold some cattle; that they milked cows and sold milk and butter and during the crop year of 1930–31, while they lived about two and a half miles from White Deer where they raised a wheat crop, she did all the cooking and washing there for the harvest hands and assisted in making the crop; that a couple of months after they had purchased the section of land in Hutchinson county, while thinking it had been conveyed to them, she found the deed and saw that it was conveyed to her mother-in-law, Mrs. Annie Moore; that the wheat

crop was stored with E. J. Moore, the uncle of her husband, as a payment on that section of land; that before that they had bought some cattle which they sold to her husband's brothers, Jerkin Moore and Albert Moore; that they got part of the money for this 125 head of cattle and later bought more cattle, running them on the Hutchinson county land which they bought; that she did not know what became of the last lot of cattle; that in 1931 her husband wanted her to go to Hot Springs, N. M., on a visit to her uncle. After she reached Hot Springs, she received the following letter from him:

"Dearest Frow:

"How are you all I am o. k. guess I will try to get out there the last of this weak about Thursday the 27th maby the 28th Skin is going to finish the wheat crop we may move west of Claton New Mex Will explain latter."

She testified that he then came to Hot Springs, remained there with her about a week, and, without any previous announcement of his intention, left her on the night of the 9th of September; that she did not know he was going to leave and he did not give any reason for doing so; that he wrote her a letter, which he mailed at Hot Springs and which she received the next day. The letter is as follows:

"To Blackie

"Thought I would let you know how things are I am leaving in fact I will be well on my way when you get this I put two hundred dollars in the bank for you The deposite slip will be with this letter I think that will run you awhile & when I sell the yearlings I will send you some more money & if the wheat brings more than it is mortgaged for I will split it with you as far as selling the yearlings & wheat now they wont bring the $1,500 to Finley & $3,300 to E. J. that is what is against them if this is not satisfactory & you think there is some other way to get more money that is your business I will try & protect my self. All the furniture Radio, Bed room Set, Living room Set & every thing except the two gas heaters & my personal things are stored with Bee at Groom for you, you can get them when you want them your geese are at White Deer with Skin & Lena they are living where we did live if you want them they will be there any time you go or send for them. As for Tommie I offered to keep him but you objected so I am leaving him with you. This is all I guess I have to say in case there is something you want to know that I don't have in this letter you can write mother & she will send me the letter."

There was inclosed with the letter a deposit slip for $200. She testified that she never had any trouble with her husband's father, but that the latter tried to get her to leave her husband.

It appears that, when I. S. Moore applied for the issuance of the insurance policy, he stated in his application that he was "widowed," which statement, of course, was false. He further stated in the application that his average monthly income during the preceding two years, exclusive of investments and pensions, had been $100 per month. It appears that this statement was also false. On May 17, 1932, after having made the statement as to his monthly income, in reply to a letter which she wrote her husband stating that she was hungry and out of work and needed money, he wrote her as follows:

"Blackie I am not hungry but broke. I don't have a dollar to send now but think I will get some before long & if so will send you some. Yes, I feel that I owe you but now is no time to sell if I could. If I sold all that I have it would not pay what is against it."

The evidence fails to disclose that he ever sent her any money or contributed anything to her support after the $200 which he deposited in the Hot Springs bank to her credit.

Although Mrs. Mercury Moore testified that her father-in-law, who was a party to this suit, had tried to induce her to abandon her husband, he did not take the stand as a witness. From the fact that the deed conveying the section of land was made to Mrs. Annie Moore, we must assume that the instrument was in her possession; and she failed to produce it in evidence for the inspection of the court and jury. An effort was made to modify the effect of this testimony by showing that I. S. Moore rendered the section of land in his name for taxes for the following year, but it seemed to have no effect upon the jury. Neither the appellant nor her husband made any effort to account for the proceeds of the 8,000 bushels of wheat which had been delivered to the uncle, E. J. Moore. What disposition was made of the proceeds of the last bunch of cattle was not shown by any of the relatives of I. S. Moore. These facts are all peculiarly within their knowledge. Witnesses could have been produced who could have accounted for this property, and the failure of appellants to do so raises a

presumption against them. 17 Tex. Jur. 302, 306, 308, 310. It was not shown that Mrs. Annie Moore, the beneficiary in the policy and the grantee in the deed to the section of land or her husband, had ever paid one penny of the premium due upon the policy or of the purchase money for the land. No reason whatever appears why she was made the beneficiary in these instruments to the exclusion of the wife of I. S. Moore. I. S. Moore's statement to his wife in the first letter he wrote to her at Hot Springs that they would probably move west of Clayton, N. M., was evidently false in the light of his subsequent abandonment of her and in the light of his further statements made in the letter he wrote and mailed the night he left her in Hot Springs, where he said, "I am leaving, in fact I will be well on my way when you get this," and after referring to the sale of the cattle and wheat, he made the further statement: "If this is not satisfactory and you think there is some other way to get more money, that is your business. I will try and protect myself." No plainer statement of his intention to abandon her permanently could be made than the fact that he told her in that letter he had arbitrarily divided their household effects, setting apart such portion thereof as he decided to give her, and finally telling her: "This is all I guess I have to say. In case there is something you want to know that I don't have in this letter, you can write Mother and she will send me the letter." The purpose of this last sentence was to inform her that he desired no further direct communication with her; that if she desired to communicate with him, it must be through his mother, whom he had made owner of the land which he had paid for, at least in part, by the proceeds of their wheat crop, and whom he later made the beneficiary in his life insurance policy. The fact that he enclosed a deposit slip for $200 in that letter, stating, "I think that will run you awhile and when I sell the yearlings I will send you some more money," which promise was never complied with, is clearly a confession upon his part that the appellee was being made the victim of his fraudulent intention to deprive her of all interest in the common property. She testified that, after he left her, she came to Canyon, remained there with a relative for awhile, then went to Glen Rose, Tex., living with other relatives until she felt she could no longer impose upon

them, and afterwards endeavored to make her own living, in the meantime appealing to him in vain for financial assistance. She testified that he did not contribute a penny toward her support after December 9, 1931.

We think this array of facts discloses a deliberate preconceived determined effort on the part of I. S. Moore to rid himself of his wife permanently, to deprive her of all interest whatever in their community estate and her rights therein, and that the jury is fully sustained in their finding that his purpose in having the policy issued to his mother was to defraud Mrs. Mercury Moore. It is not questioned, and cannot be, that the amount of the premium paid was community property of the assured and his wife. There is not a scintilla of testimony that Mrs. Annie Moore or her husband paid any part of it. It is unnecessary for us to discuss whether the proceeds of the policy upon the death of I. S. Moore became separate or community property. There were no children and no creditors, and as the surviving wife Mrs. Mercury Moore would be entitled to all of the personal property of the community estate. The jury who heard the parties testify have written their verdict, and we do not feel authorized to set it aside.

In the case of Martin v. Moran, 11 Tex. Civ. App. 509, 32 S. W. 904, 905, the language used by Judge Head is applicable to the facts of this case. While it is held in that case that the proceeds of the insurance policy constitute community property, Judge Head relied strongly upon the proposition that the act of the husband in trying to deprive his wife of the proceeds of the policy constituted fraud. He states: "It can hardly be said that the husband, by virtue of the power given him to dispose of the community property, has the unlimited right to use it in buying insurance policies, and giving them to third parties. Neither can it be said that the wife should be restricted to her interest in the premiums paid for the policies, because she has as much interest in the profits made by the husband's trades as she has in the consideration paid. She is required to share the losses he makes, and as part compensation is given the right to participate in the gains. In Stramler v. Coe, 15 Tex. 215, it is said: 'No consent of the wife is necessary to a valid alienation of such (community) property by the husband. But excessive or capricious donations and sales, made with the intent to defraud the wife, would be void; and she would be en-

936

titled to her action against the property of the husband and against third possessors.' Also see Wright v. Hays' Adm'r, 10 Tex. 133 [60 Am. Dec. 200], and Scott v. Maynard, Dallam, Dig. 548. It seems to us that for the husband to purchase insurance policies with community property, and make them payable as directed in his will, or to a third person, for the purpose of making them his separate property, would be a disposition in fraud of the rights of the wife, within the meaning of these decisions."

The policy which was introduced in evidence shows that by its terms I. S. Moore during his lifetime would have been entitled to certain benefits. In other words, he did not have to die to win. This is a circum-stance throwing some light upon his intention in having the policy made payable to his mother instead of his wife and which the jury had the right to consider and doubtless did consider in determining the question of fraudulent intent.

There are other issues which were involved in the case in the trial court, but the sole contention upon this appeal and the controlling issue is whether the finding of the jury is sustained by the evidence. Feeling that it is sustained by the overwhelming weight of the testimony, we are not authorized to disturb it.

The motion for rehearing is therefore overruled, the former opinion is withdrawn, and the judgment is affirmed.